UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANTHONY CRAIG, M.D., Ph.D. *Plaintiff,* | : : |
| | : CIVIL NO. |
| V. | : : |
| YALE UNIVERSITY SCHOOL OF MEDICINE, YALE-NEW HAVEN HOSPITAL, ERROL NORWITZ, M.D., PhD, Director of Obstetrics & Gynecology Residency Program and JULIA SHAW, M.D., MBA, Associate Director of Obstetrics & Gynecology Residency Program, in their official and individual capacities *Defendants.* | : : : : : : : : : : OCTOBER 12, 2010 |

## COMPLAINT

1.  This is an action for money damages to redress the deprivation by the defendants, through their agents, servants and/or employees, of the rights secured to the plaintiff by the Constitution and laws of the United States. Defendants, through their agents, servants and/or employees, were responsible for violating plaintiff's federal statutory rights, and thereby improperly deprived him the freedom and liberty afforded to all citizens of this State and Country, without any cause, justification or excuse.

2.  Jurisdiction of this court is invoked pursuant to 28 U.S.C. Sections 1331 and 1343(3), and 42 U.S.C. §2000e, et seq. and Article I, Section 1 of the Connecticut Constitution which confers pendent jurisdiction upon this court with respect to any cause of action under state law.

## THE PARTIES

3. During all times mentioned herein, the plaintiff, Anthony Craig, M.D., Ph.D. ("plaintiff" or "Craig"), was a citizen of the United States, residing within the state of Connecticut, county of New Haven, city of New Haven. The plaintiff is male of gender, African-American of race and black of color.

4. At all times mentioned herein, the defendant, Yale University School of Medicine, (the "defendant") was and is a medical facility providing educational and medical services to its students and the general public and employs over 500 persons.

5. At all times mentioned herein, the co-defendant, Yale-New Haven Hospital, (the "co-defendant") was and is a medical facility providing medical services to the general public and employs well over 2,000 persons, (Yale University School of Medicine and Yale-New Haven Hospital are collectively referenced herein as the "defendants").

6. At all times mentioned herein, the co-defendant, Dr. Errol Norwitz ("Norwitz") was the Director of the Obstetrics & Gynecology Residency Program at the defendant facility. Norwitz is being sued in his official and individual capacities.

7. At all times mentioned herein, the co-defendant, Dr. Julia Shaw ("Shaw") was the Associate Director of the Obstetrics & Gynecology Residency Program at the defendant facility. Upon information and belief, Shaw has now become the Director of the Obstetrics & Gynecology Residency Program at the defendant facility. Shaw is being sued in her official and individual capacities.

**COUNT ONE**:   (Title VII/Race and Color as Against Yale University School of Medicine and Yale-New Haven Hospital)

8. The plaintiff entered the Obstetrics & Gynecology Residency Program ("the Program") which is affiliated with Yale-New Haven Hospital ("YNNH") in June 2008; his graduation from the Program was scheduled to occur in 2012.

9. On or about November 4, 2008, the plaintiff met with Norwitz, the Program Director and Manager of Medical Education, who is caucasian of race and white of color, to discuss some of plaintiff's preliminary unfavorable evaluations. During this meeting, plaintiff was informed his evaluations would be revisited at his formal six-month evaluation.

10. On or about November 11th, plaintiff again met with Norwitz who indicated he had been watching plaintiff and that he had been doing a "good job". This meeting was requested by plaintiff to discuss the aforementioned meeting of November 4th concerning his evaluations. At this time, plaintiff expressed to Norwitz he was concerned about fighting a losing battle.

11. At no time was plaintiff advised, either verbally or in writing, that his failure to improve would result in his dismissal from the Program. While plaintiff admits he made some clinical and administrative errors during his first six months, none of these mistakes came remotely close to meeting the definition of gross misconduct as defined in the House Staff Manual or Resident Handbook, which could lead to dismissal from the Program.

4

12. The aforementioned House Staff Manual and Resident Handbook also states that the process of dismissal from the Program should be *progressive* in nature, and thus include a verbal warning, a written warning and probation where appropriate. Plaintiff never received *any* of the aforecited warnings leading up to dismissal, nor was he offered probation. Importantly, this progressive discipline process is also mandated by the Accreditation Council's Graduate Medical Education ("ACGME") policy, entitled *Resident Probation, Suspension or Dismissal from the ACGME Accredited Training.*

13. Although plaintiff made significant and measurable improvements in the areas discussed in the November 4, 2008 meeting, when the plaintiff attended his six month evaluation meeting on December 15, 2008, to his utter shock and amazement, he was informed he was being **dismissed** from the Program.

14. Norwitz, who on November 11, 2008, told the plaintiff he was doing a "good job", now was of the view that he should be completely removed from the Program.

15. At the time of his dismissal, despite the fact that the purpose of the meeting was supposed to be to review plaintiff's performance and evaluation, Norwitz indicated to plaintiff it would not be necessary for Craig to see his evaluations and that he should seek work in a lab. However, in accordance with the ACGME guidelines at Sec. V.A.1.b(4) and V.A..1.c., Craig was *entitled* to obtain a copy of the comments contained within his evaluations so that he could respond to them appropriately. Plaintiff was not given a copy of any of the critical evaluations and/or comments made by his instructors and/or colleagues, despite his timely

5

request for them.

16. Plaintiff asked to see the evaluations on December 16th at which time he was told by Norwitz they would be given to him by Dr. Pettker on December 17th. When Dr. Pettker gave Craig his evaluations on December 17th, he did not provide all of them and told plaintiff he would have to get the rest from Norwitz. On December 22nd, plaintiff *finally* received a full set of evaluations.

17. Further, plaintiff was supposed to provide a list of the attending physicians that he had worked with at the end of his rotation so they could submit their evaluations of him. This is standard policy for all residents in the Ob/Gyn department. As a result of the exceedingly stressful and abrupt manner in which Craig was dismissed from the Program, he did not get the opportunity to provide a list of attending physicians with who he had worked. Therefore, the vast majority of the physicians he worked with were never able to submit evaluations and as a consequence, his evaluations were incomplete.

18. It should be noted that Craig passed *all* of his other rotations in every other department within defendants' facilities in which he practiced medicine (i.e., Emergency Medicine and Surgical Intensive Care).

19. Plaintiff was forced to endure a hostile work environment throughout his time in the Program. For example, on December 14, 2008, Craig was repeatedly referred to as "boy" by an Attending Physician in Gynecology.

20. Significantly, plaintiff chose to attend Yale's Program over several other residency programs he was accepted into. To be terminated in the middle of his first year made it virtually impossible for him to find timely placement in another

6

OB/GYN program and, therefore, plaintiff, at the minimum, will be forced to repeat a substantial portion of the residency training in the event he is belatedly accepted into another Program.

21. On or about December 22, 2008, plaintiff successfully filed a grievance with Karen McCausland, Administrative Coordinator, Office of Graduate Medical Education and was reinstated into the Program as the grievance panel providently found the defendant failed to adhere to its own progressive discipline policy, as it refused to offer any period of probation to the plaintiff.

22. Notwithstanding plaintiff being reinstated, he was specifically told by Shaw, then Associate Director of the Program, who is caucasian of race and white of color, he would "not be treated fairly" upon his return to the Program and also advised him to find work at another hospital, despite the fact that he had won the grievance.

23. In fact, Shaw went so far as to indicate the plaintiff had a "1 in 1000" chance of passing the probationary period of the Program. Despite the opportunity for the plaintiff to prove himself through his professional skills and knowledge, the defendants and co-defendants apparently had already made up their collective minds as to the outcome of plaintiff's return to the Program.

24. Further, upon Craig's return for his probationary period, he was assigned complicated high-risk patients that are normally not seen until the third year of residency in the High-Risk Clinic. There was one example of plaintiff purposely being made late one morning and was then charged with being late and

also that much of his time was spent wastefully and not seeing patients.

25. Lastly, during Craig's probationary period, several physicians cavalierly gave him failing grades on surgical skills when, in point of fact, he had not even performed any surgeries.

26. The actions of the defendants, through their agents, servants and/or employees, in creating and perpetuating a hostile work environment throughout the course of his participation in the Program, have caused Craig to suffer severe emotional, psychological, financial and physical injuries and damages stemming from the wrongful acts of the defendants' agents, servants and/or employees as aforecited, all to his permanent detriment and loss. These actions included, but were not limited to, the harassment of African American males who aspired to be physicians which included the plaintiff, as well as subjecting him to discriminatory, disparate treatment.

27. In response to the aforedescribed conduct by the defendants through their agents, servants and/or employees, the plaintiff availed himself of the administrative procedures created through the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunities Commission ("EEOC") by filing a Complaint Affidavit with said agencies. See Ex. A attached.

28. The plaintiff has satisfied all statutory conditions precedent to bringing the instant matter by exhausting all applicable administrative remedies.

29. The aforedescribed conduct of the defendants through their agents, servants and/or employees, was motivated, at least in part, by plaintiff's race which

is African American and his color which is black.

30. The acts of the agents, servants and/or employees of the defendants through were in the nature of discriminatory and harassive conduct in substantial part due to his race and/or color and, therefore, were in violation of 42 U.S.C. Section 2000e, et seq., (hereinafter referred to as Title VII).

COUNT TWO:  (Title VII/Gender as Against Yale University School of Medicine and Yale-New Haven Hospital)

1-29. Paragraphs 1 through 29 of the First Count are hereby incorporated by reference and made Paragraphs 1 through 29 of the Second Count, as if fully set forth herein.

30. In an email from Shaw, dated March 11, 2009, Shaw vindictively and discriminatorily indicated that the other residents were "unhappy" with the grievance council's decision to reinstate plaintiff to the Program and that they, as well as the faculty, needed to be "counseled" before his return.

31. Plaintiff constantly felt isolated and had little, if any, interaction with either the staff or any of his colleagues. None of the other similarly situated student residents who were caucasian of race, white of color and male of gender had to endure this type of isolation, which, in effect, constituted a hostile work environment.

32. Moreover, it is significant to mention that the termination rate of African American male residents in the Program over the past ten (10) years has been approximately sixty-seven percent (67%), or at least two-thirds of those admitted. Hence, a pattern and practice of discrimination exists within the Program,

which includes, but is not limited, to an overtly hostile work environment and disparate treatment, that has been perpetrated by the agents, servants and/or employees of the defendants against African American male candidates in general and the plaintiff in particular.

33. The aforedescribed conduct of the defendants, through its agents, servants and/or employees, was motivated, at least in part, by plaintiff's gender.

34. The acts of the agents, servants and/or employees of the defendants through were in the nature of discriminatory and harassive conduct in substantial part due to his gender and, therefore, were in violation of 42 U.S.C. Section 2000e, et seq., (hereinafter referred to as Title VII).

**COUNT THREE:** **(Wrongful Discharge as Against Yale University School of Medicine and Yale-New Haven Hospital)**

1-29. Paragraphs 1 through 29 of the First Count are hereby incorporated by reference and made Paragraphs 1 through 29 of the Third Count, as if fully set forth herein.

30. As a direct result of the defendants' acts, through its agents, servants and/or employees, in its failure to provide the plaintiff with either a verbal or written warning, or a suspension, as it would customarily do prior to similarly situated employees being terminated, resulted in Craig sustaining severe emotional, psychological, financial and/or physical injuries and damages stemming from the defendant's wrongful acts, all to his permanent detriment and loss.

30. The defendants' failure, through its agents, servants and/or

employees, to adhere to its own custom and policies regarding the issue of notice and warnings, either by way of verbal, written or in the form of a suspension in the nature of progressive discipline prior to termination, constituted Craig's wrongful discharge from the Program in violation of the professed public policy of the defendant that it is an equal opportunity employer.

COUNT FOUR:   (Breach of Contract as Against Yale University School of Medicine and Yale-New Haven Hospital)

1-29.   Paragraphs 1 through 29 of the First Count are hereby incorporated by reference and made Paragraphs 1 through 29 of the Fourth Count, as if fully set forth herein.

30.   Effective June 21, 2008, the plaintiff entered into the Program; his completion of the Program was scheduled to occur in 2012.  Plaintiff performed all of his academic obligations under the Program and was ready, willing and able to continue doing so throughout his enrollment in the Program.

31.   On or about December 23, 2008, by letter, after only six (6) months of his internship in the Program, defendants breached their agreement with plaintiff by terminating him without cause.

32.   The defendant's House Staff Manual and Resident Handbook states that the process of dismissal from the Program should be progressive in nature, and thus include a verbal warning, a written warning and/or probation where appropriate.  Plaintiff failed to receive any of the aforecited warnings leading up to his dismissal from the Program.  Moreover, plaintiff was never offered any period

of probation. The aforedescribed progressive discipline regime is mandated by Yale-New Haven Medical Center's Policies and Procedures, entitled *Resident Probation, Suspension or Dismissal from the ACGME Accredited Training*.

33. As a direct, proximate and consequential result of defendants' breach of their employment agreement with plaintiff, he has been deprived of his place in the Program, the salary and fringe benefits that were included, the opportunity to supplement his income with other activities associated with employment as an accredited physician, as well as deprived of future income he would have received upon completion of the Program.

**COUNT FIFTH:** **(Tortious Interference in Business Relations as Against Yale University School of Medicine, Yale-New Haven Hospital and co-defendants Norwitz Shaw)**

1-29. Paragraphs 1 through 29 of the First Count are hereby incorporated by reference and made Paragraphs 1 through 29 of the Fifth Count, as if fully set forth herein.

30. On or about December 22, 2008, plaintiff successfully filed a grievance and was reinstated into the Program as the grievance panel found defendants did not follow their own progressive discipline policy.

31. Notwithstanding this, Craig was specifically told by co-defendant Shaw, who is caucasian of race and white of color, that he would "not be treated fairly" upon his return to the Program.

32. In fact, co-defendant Shaw went so far as to indicate that the plaintiff had a "1 in 1000" chance of passing the probationary period of the Program.

Despite the opportunity for the plaintiff to prove himself through his professional skills and knowledge, the defendants and co-defendants apparently had already made up their collective minds as to the outcome of plaintiff's return to the Program.

33. Defendants' decision to not allow plaintiff a fair and fresh start in the defendant's Residency Program was a significant detriment to Craig's career. Plaintiff had been attracted to Yale in large measure because of its reputation and the nature of the Program it offered. Being terminated in the middle of his first year made it virtually impossible for him to find timely placement in another OB-GYN program and, therefore, at a minimum, plaintiff will be forced to repeat a substantial portion of residency training, despite the fact that he passed *all* of his other rotations in every other department within defendants' facilities in which he practiced medicine.

34. Further, Craig found it extremely difficult to explain the problematic circumstances in which he was forced to leave the Program and thus found it difficult to find placement in another residency program.

35. Without legal justification, defendants and co-defendants, through their agents, servants and/or employees, intentionally, improperly and maliciously interfered with plaintiff's ability to be a part of any residency program, thus depriving him of significant educational and economic opportunities.

36. As a direct, proximate and consequential result of defendants and co-defendants' conduct, through their agents, servants and/or employees, Craig has suffered and will continue to suffer lost employment opportunities, income, additional tuition costs, and other damages.

13

37. The loss of plaintiff's position caused him substantial harm depriving him of gainful employment and denying him the opportunity to advance his career.

COUNT SIX:     (Intentional Infliction of Emotional Distress as Against Yale University School of Medicine, Yale-New Haven Hospital and co-defendants Norwitz and Shaw)

1-29. Paragraphs 1 through 29 of the First Count are hereby incorporated by reference and made Paragraphs 1 through 29 of the Sixth Count, as if fully set forth herein.

30. The defendant and co-defendants through their agents, servants and/or employees, during the course of taking the aforedescribed employment actions against the plaintiff, intended to inflict emotional distress upon him and knew, or should have known their discriminatory, harassing and retaliatory conduct would likely cause emotional distress.

31. The aforedescribed conduct of the defendants and co-defendants through their agents, servants and/or employees, were extreme and outrageous and caused Craig severe emotional distress and trauma, sleeplessness, loss of appetite, a substantial loss of employment income, overly burdensome financial hardships, damage to his relationship with his family and friends, as well as damage to his self-esteem and sense of self-worth.

32. The aforedescribed acts of the defendants and co-defendants, through their agents, servants and/or employees, constituted the intentional infliction of emotional distress.

14

**WHEREFORE**, the plaintiff claims judgment against the defendants as follows:

a. Compensatory damages in an amount this court shall consider just and fair;

b. Punitive damages in an amount this court shall consider just and fair;

c. Attorney's fees and the reimbursement of costs associated with the bringing of the instant action;

d. Reimbursement of back wages and re-establishment of any and all additional benefits and reinstatement to the Program to which plaintiff would have been entitled had he not been wrongfully discriminated against and discharged from the Program; and

e. Such other relief as this court shall consider to be just, fair and equitable.

PLAINTIFF, ANTHONY CRAIG, M.D., Ph.D.

BY:____\s_____
Law Office of
W. Martyn Philpot, Jr., LLC
409 Orange Street
New Haven, CT  06511-6406
Tel. No. (203) 624-4666
Federal Bar No. ct05747
His Attorneys

The plaintiff hereby requests a trial by jury.