UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Anthony Craig, M.D., Ph.D.,<br>    *Plaintiff*,<br><br>           v.<br><br>Yale University School of Medicine et al.,<br>    *Defendants*. | Civil No. 3: 10cv1600(JBA)<br><br><br><br>December 22, 2011 |

RULING ON DEFENDANTS' MOTIONS TO DISMISS

Plaintiff Anthony Craig, M.D., Ph.D., is an African–American male and former resident in the Obstetrics & Gynecology Residency Program (the "Program") at Yale–New Haven Hospital ("YNHH"). Following the termination of Craig's employment in the Program on April 23, 2009, he sued Defendants—the Yale University School of Medicine ("YUSM"), YNHH, Dr. Errol Norwitz (in his individual capacity and as the Director of the Program), and Dr. Julia Shaw (in her individual capacity and as the Associate Director of the Program). Plaintiff filed an Amended Complaint [Doc. # 33] asserting seven causes of action, five of which is he pursuing[1]: Count One: Title VII (42 U.S.C. § 2000e, et seq.), Race

---

[1] In Count Four of his Amended Complaint, Craig claims that YUSM and YNHH discriminated against him due to his race when they failed to follow the Program's internal policy for progressive discipline, (Am. Compl. ¶¶ 27–28), violating the "well established public policy against race and/or color discrimination by an employer, which is codified in Connecticut General Statutes § 46a-60" (*id.* ¶ 29). In light of this statutory remedy, Craig recognizes that his common law wrongful discharge claim as to both YNHH and YUSM is not viable, but now argues that Count Four is actually a disparate treatment claim under Title VII. (Craig Opp'n at 10–11.) Count Four is entirely silent as to Title VII and only makes an explicit reference to Connecticut's "professed public policy against race and/or color discrimination by an employer." (Am. Compl. ¶ 29.) At oral argument, Plaintiff conceded that he had not pursued a CHRO claim or an EEOC claim against YUSM, and agreed that Count Four should be dismissed against both parties. Thus, Count Four is dismissed.

and Color Discrimination (against YNHH); Count Two: 42 U.S.C. § 1981, Race and Color Discrimination (against Norwitz and Shaw); Count Three: Title VII (42 U.S.C. § 2000e, *et seq.*), Gender Discrimination (against YNHH); Count Five: Breach of Contract (against YUSM and YNHH); Count Seven: Intentional Infliction of Emotional Distress (against all Defendants). All Defendants have moved to dismiss Count Seven of the complaint for failure to state a claim. (*See* YUSM, Norwitz, and Shaw's March 3, 2011 Motion to Dismiss [Doc. # 36]; YNHH's March 4, 2011 Motion to Dismiss [Doc. # 37].) YNHH has also moved to dismiss Count Three. (*See* YNHH Mot. Dismiss.) For the reasons that follow, Defendants' motions will be granted in part and denied in part.

I.   Factual Allegations

Plaintiff alleges the following facts. He began employment with YNHH in June 2008 when he entered the Obstetrics & Gynecology Residency Program run by YUSM and was scheduled to graduate in 2012. (Am. Compl. ¶ 8.) On November 4, 2008, Norwitz, then Director of the Program at YNHH, met with Craig to discuss unfavorable preliminary evaluations of his performance to date. (*Id.* ¶ 9.) Plaintiff was informed that his evaluations would be revisited at his formal six–month evaluation. (*Id.*) During a follow up meeting on November 11, 2008, Norwitz expressed that Craig had been doing a "good job." (*Id.* ¶ 10.)

Craig was "utter[ly] shocked" when, despite his "significant and measurable improvements," Norwitz dismissed him from the program at the time of his formal six–month evaluation on December 15, 2008. (*Id.* ¶¶ 13–14.) Following his dismissal, YUSM

---

As to Count Six, Craig "declines to pursue this claim and, therefore, does not contest defendants' challenges thereto." (Pl.'s Opp'n [Doc. # 39] at 5.) Therefore Defendants' motions to dismiss Count Six are granted.

took seven days to provide Craig with copies of all the evaluations that he was entitled to under the Accreditation Council's Graduate Medical Education (ACGME) policy. (*Id.* ¶¶ 15–16.) Norwitz told Plaintiff that he did not need to see his evaluations and that he should aim to work in a lab rather than in a residency program. (*Id.* ¶ 15.)

The YNHH "House Staff Manual" suggests, and the ACGME policy mandates, that the dismissal process be "progressive in nature"; that is, the process should include a verbal warning, a written warning, and then probation. (*Id.* ¶ 12.) On December 22, 2008 Craig filed a grievance with the Office of Graduate Medical Education claiming that YNHH did not comply with either the staff manual or the ACGME policy in terminating his residency. (*Id.* ¶ 12.) The grievance panel agreed and found that YNHH had failed to follow its own progressive discipline policy. (*Id.* ¶ 21.) As a result, Craig was reinstated to the Program on a probationary basis. (*Id.*)

Shaw, the Associate Director of the Program, told Craig that he had a "1 in 1000" chance of satisfactorily completing the probationary period, that he would "not be treated fairly" upon his return, and advised him to seek work in another hospital. (*Id.* ¶¶ 22–23.) In a March 11, 2009 email, Shaw also told Craig that other residents in the program were "unhappy" with the grievance council's decision to reinstate him and that the other residents, as well as the faculty, needed to be "counseled" prior to his return. (*Id.* ¶ 30.)

Upon his return, Craig felt constantly isolated and had little if any interaction with his colleagues as a result of Shaw's email (*id.* ¶ 31), unlike any of the other, similarly–situated white male residents (*id.*). Craig was unable to properly care for his patients because he was assigned "complicated high–risk patients" that were usually not seen until a resident's third year in the Program. (*Id.* ¶ 24.) Craig endured multiple comments

3

from Norwitz suggesting that he seek "counseling for depression." (*Id.* ¶ 28.) He also received failing grades from "several physicians" on his surgical skills, when he had in fact never performed any surgeries. (*Id.* ¶ 25.) Additionally, over the past ten years, African–American male residents have been terminated from the Program at a rate of approximately 67 percent. (*Id.* ¶ 32.) Another African–American male was terminated from the program in 2007. (*Id.* ¶ 33.)

II.     Discussion[2]

    A.     Gender–Based Title VII Claim

YNHH moves to dismiss Count Three, in which Craig claims that YNHH subjected him to a "pattern and practice of discrimination" that was "in substantial part due to his gender." (Am. Comp ¶¶ 32, 35 (Count Three).) Specifically, YNHH argues that Plaintiff's allegations of gender–based discrimination in Count Three are either conclusory, e.g., Defendants discriminated against "African American male candidates in general and the plaintiff in particular" (Am. Compl. ¶ 32); their conduct was "motivated, at least in part, by Plaintiff's gender" (*id.* ¶ 34); and the acts of their agents against Craig were "in substantial part due to his gender" (*id.* ¶ 35), or do not state a claim for gender discrimination. (YNHH Mot. Dismiss at 5.) The non–conclusory statements that YNHH contends do not state a

---

[2] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

claim for gender discrimination are (1) Craig is "male of gender" (Am. Compl. ¶ 3); (2) "none of the other similarly situated student residents who were Caucasian of race, white of color, and male of gender had to endure this type of isolation" (*id.* ¶ 31); (3) "the termination rate of African American male residents in the program over the past ten (10) years has been approximately sixty-seven percent (67%)" (*id.* ¶ 32); and (4) another African American male resident was terminated in 2007 (*id.* ¶ 33). (YNHH Mot. Dismiss at 4–5.)

Craig argues that the fact that white male residents were not subjected to discrimination, that another black male resident was terminated, and that 67% of black male residents are terminated from the program reveals an underlying discriminatory motivation for his "specific bad treatment," including (1) disparate, harassing treatment by the Program's directors; (2) not being given a proper chance to prove himself on probation; (3) improperly being terminated without first being placed on probation; (4) being called 'boy'[3]; (5) receiving failing grades for surgeries he never performed, and (6) causing his isolation and lack of interaction with his colleagues. (Craig Opp'n at 9.) Craig also maintains that the 'big picture' includes continuous "latent prejudice and long standing bigotry," stemming from the historical "social taboo towards African American men, particularly when they are involved in interpersonal relationships with Caucasian of race and white of color women." (*Id.* at 8.) He contends "YNHH's horrendous track record of failing to graduate African American males from its OB/GYN Program," in light of this "historical shame of bigotry and prejudice . . . gives rise to an inference of discrimination against African American males in YNHH's OB/GYN Program in general, and the plaintiff in particular." (*Id.* at 9.) YNHH

---

[3] On December 14, 2008, the day prior to his initial dismissal, the Attending Physician (unidentified) repeatedly called Craig "boy." (*Id.* ¶ 19.)

5

responds that the cited termination rate and the recent termination of another African American male resident are irrelevant as a measure of the comparative termination rates of male and female residents. (YNHH Mot. Dismiss at 4–5.)

While Craig's reliance on other males as comparators cannot support a pure gender discrimination claim,[4] the 67 percent termination statistic and the termination of another black male plausibly claim that Plaintiff's race plus his gender, taken together, were factors in Defendant's decision-making and actions. From Plaintiff's counsel's remarks at oral argument, it is clear that this statistic illustrates the crux of Craig's allegations—that he was discriminated against because he was an African-American male who sought to practice medicine in the OB/GYN field. Under Count One, Plaintiff has pled sufficient facts to make out a cognizable "intersectional claim," or a "race plus" claim of discrimination against black males, which can exist even without proof of discrimination against African-American women or against white males.[5] *See, e.g.*, *Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025 (5th Cir. 1980) ("discrimination against black females can exist even in the absence of discrimination against black men or white women"); *Kimble v. Wis. Dept. of*

---

[4] *See Jeffers v. Thompson*, 264 F. Supp. 2d 314, 327 (D. Md. 2003) ("[b]ecause one of the applicants selected was a woman, and because no other evidence of pure gender discrimination has been adduced, Mr. Jeffers has failed to establish a *prima facie* case of pure gender discrimination. . . . She has, however, established a *prima facie* case of composite, race-and-gender discrimination because HHS did not promote an African-American woman.").

[5] The Supreme Court recognized the "sex plus" theory of discrimination in *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971), where the plaintiff challenged her employer's policy of accepting applications from men with pre-school aged children but not accepting applications from women with pre-school aged children. ("The Court of appeals . . . erred in reading [Section 703 of the Civil Rights Act of 1964] as permitting one hiring policy for women and another for men—each having pre-school-age children.").

*Workforce Development*, 690 F. Supp. 2d 765, 770–71 (E.D. Wis. 2010) ("Conceptualizing separate over–lapping black and male categories has sometimes interfered with the recognition that certain distinctive features of being black and male serve as the target for discrimination."); *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 326 (D. Md. 2003) ("some characteristics, such as race, color, and national origin, often fuse inextricably . . . Title VII prohibits employment discrimination based on any of the named characteristics, whether individually or in combination.").[6]

Accordingly, because Plaintiff has not pled sufficient facts to support a plausible claim of pure gender discrimination, Count Three must be dismissed, but Plaintiff's composite claim of "race plus" discrimination may proceed under Count One.

B.      Intentional Infliction of Emotional Distress

For an intentional infliction of emotional distress ("IIED") claim to survive a motion to dismiss, the plaintiff must plead facts which could plausibly support four elements: (1) that the defendant intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. *Appleton*

---

[6] Although the Supreme Court has never expressly addressed composite claims based on "race plus" discrimination under Title VII, in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), in response to the Defendant's argument that the plaintiffs had not been discriminated against because they had not identified a comparison class of similarly situated individuals that had been given preferential treatment, the Supreme Court concluded that "Congress had a more comprehensive view of the concept of discrimination advanced in the ADA." 527 U.S. 581, 599 n.10. In support of this reasoning, Justice Ginsburg quoted *Jefferies*: "discrimination against black females can exist even in the absence of discrimination against black men or white women."

*v. Bd. of Ed. of the Town of Stonington,* 254 Conn. 205, 210 (2000). Defendants argue that Craig has failed to state a claim for IIED because he (1) did not identify any conduct by the Defendants that was extreme and outrageous, and (2) did not suffer emotional distress that was sufficiently severe. (YUSM Mot. Dismiss at 10; YNHH Mot. Dismiss at 13.)

### 1. *Extreme and Outrageous Conduct*

Under Connecticut tort law, conduct is considered extreme and outrageous if it "exceeds all bounds usually tolerated by decent society." *Appleton*, 254 Conn. at 210–11 (quoting 1 Restatement (Second), Torts § 46, cmt. d (1965)). The Court decides, as a threshold matter, whether the allegations could rise to the level of extreme and outrageous. *Appleton,* 254 Conn. at 210. This threshold question is generally amenable to disposition at the summary judgment stage because the question is whether reasonable minds could disagree as to the nature of the conduct, such that it becomes a question for the jury. *Id.*

Generally, personnel actions or workplace conduct that falls within the reasonably expected "vicissitudes of employment," *Perodeau*, 259 Conn. 729, 757, including "insults, verbal taunts, threats, indignities, annoyances, petty oppressions or conduct that displays bad manners or results in hurt feelings," even if unlawful, are usually not deemed extreme and outrageous conduct. *Tomby v. Cmty. Renewal Team, Inc.,* No. 3:09cv1596(CFD), 2010 WL 5174404*, *7 (D. Conn. Dec. 15, 2010); *see also Williams v. Deloitte Servs.*, LP, No. 3:09cv17(JCH), 2009 WL 3571365, *3 (D. Conn. Oct. 26, 2009) (IIED claim dismissed because allegations of preferential treatment of white employees, unfair disciplinary actions, unfair work assignments, negative performance reviews, and singling out fell within the category of "routine employment actions" and thus did not rise to the level of extreme or outrageous); *Appleton,* 254 Conn. at 211–12 (defendant's conduct (1) subjecting plaintiff to

8

condescending comments in front of her colleagues; (2) requiring plaintiff submit to two psychiatric examinations; and (3) suspending plaintiff prior to her eventual resignation did not reach the level of extreme and outrageous).

Plaintiff's IIED claim incorporates the allegations of his other counts: that Defendants deviated from the required progressive disciplinary procedure; that the Associate Director of the Program told him that he would not be treated fairly and only had a "1 in 1000" chance of passing his probationary period; that Defendants assigned him high–risk patients that he could not properly treat; he was given failing grades for procedures he never performed; that Norwitz "continuously suggested that plaintiff seek counseling for depression" without reason (Am. Compl. ¶ 28), and that he returned to the Program on a probationary basis, which started with Shaw's email that other residents and faculty were unhappy about his return and "would all need counseling prior to plaintiff's re–admission" (*id.* ¶ 29).

Craig deplores Defendants' 'slice and dice' approach that "isolate[s] events . . . complained of so as to minimize them,"(Craig Opp'n at 18) "interpret[s] the events in a sterile non–contextual manner" (*id.*), and therefore ignores "what actually happened to [him] and the outrageousness of defendants' collective conduct" (*id.* at 20). Since there is no bright line rule to determine what constitutes extreme and outrageous conduct, Plaintiff's allegations will be considered in their totality within the context of his specific situation. *See Joiner v. Chartwells*, No. 3:05cv845(JCH), 2005 WL 3499995, *3 (D. Conn. Dec. 20, 2005) (analyzing the plaintiff's allegations in the aggregate).

The Connecticut Supreme Court has recognized that "[t]here are few things more central to a person's life than a job, and the mere fact of being demoted or denied

9

advancement may be extremely distressing." *Perodeau*, 259 Conn. 729, 757. However, Craig's allegations plausibly claim that far more than mere loss of a job was at stake. Craig chose "Yale's Program over several other residency programs he was accepted into" (Am. Compl. ¶ 20), because of the school's "reputation and the nature of the Program it offered" (*id.* ¶ 30). He contends that the Defendants "intentionally, improperly, and maliciously interfered with [his] ability to be part of any residency program" (*id.* ¶ 33), and tried to shunt him off to laboratory work (*id.* ¶ 15). Plaintiff also points to his subordinate relationship to the individual defendants as a recognized factor that could raise otherwise insufficient conduct to the level of extreme and outrageous. Indeed, the Restatement of Torts specifically identifies extreme abuse of power or authority as actionable conduct.[7] *See also Sangan v. Yale University*, No. 3:06cv587(PCD), 2006 WL 2682240, *6 (D. Conn. Sept. 15, 2006) ("behavior which otherwise fails to constitute extreme and outrageous conduct may yet rise to that intolerable level, and thus be actionable as IIED, when it 'arise[s] from an abuse by the actor of a position . . . which gives him actual or apparent authority over the other or power to affect his interests'").

While this question is a close one, viewing the implications of Plaintiff's allegations expansively, the Court concludes that it is at least plausible that a more fully–developed record of the hierarchical context in which this conduct took place could show that reasonable minds could differ as to whether the conduct was extreme and outrageous or not. Defendants seek to depict Plaintiff's allegations as mere "hurt feelings" in the employment

---

[7] The Restatement commentary notes, "[i]n particular police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their position." Restatement (Second) of Torts § 46 cmt. e.

10

context, however, a medical residency program is substantially more than a typical employment environment. The completion of one's medical residency is an essential requirement for a clinical or academic medical career,[8] and thus a failure to complete a residency program may present insurmountable obstacles to pursuing one's chosen field of medicine. Defendants Norwitz and Shaw could be seen as more than employers: as directors of Plaintiff's residency program, they had significant control over the future of his career in medicine. Furthermore, Plaintiff's allegations support the inference that his challenge to the actions of these directors to the Grievance Committee was met with a response that his audacity would be nonetheless futile.

Though the "rough edges of our society are still in need of a good deal of filing down," and "plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language," Restatement (Second) § 46, cmt. d. (citing Magruder, Mental and Emotional Disturbance in the Law of Torts, 47 Harv. L. Rev. 1033, 1053 (1936)), the aphorisms that are routinely applied to the "extreme and outrageous conduct" element of IIED claims cannot be usefully applied without context—here, a medical residency program. At this motion to dismiss stage, without yet having Defendants' responses to frame this

---

[8] Yale School of Medicine describes its Gynecology residency program:

> The primary goal of residency training at Yale is to produce OB/GYN clinicians with an outstanding fund of knowledge, a strong theoretic base, and expert surgical skills to serve the community at large. We believe that sound clinical skills are critical to superior performance in the postgraduate years, regardless of whether one remains in an academic medical center or enters private practice.

Residency Program, Obstetrics, Gynecology & Reproductive Sciences, Yale School of Medicine, http://medicine.yale.edu/obgyn/education/residency/index.aspx.

context, it is at least more plausible than speculation that Defendants' conduct could be viewed as an abuse of a hierarchical power relationship, rising to the level of extreme and outrageous conduct.

## 2. *Severe Emotional Distress*

The fourth element of an IIED claim requires that "the emotional distress sustained by the plaintiff was severe." *Appleton,* 254 Conn. at 205. In Connecticut, the distress must be "so severe that no reasonable person could be expected to endure it." *Tomby,* 2010 WL 5174404 at *7 (quoting *Buster v. City of Wallingford*, 557 F. Supp. 2d 294, 302 (D. Conn. 2008)). Craig claims that the Defendants' conduct caused him to suffer severe emotional and psychological distress; trauma; sleeplessness; loss of appetite; substantial loss of employment income; overly burdensome financial hardships; damage to his relationship with his family and friends; and damage to his self–esteem and sense of self–worth. (Am. Compl. ¶ 20 (Count One), ¶ 30 (Count Seven).)

Defendants argue that these factual allegations if proved could not support an inference that his emotional distress was such that "no reasonable person could be expected to endure." (*See* YUSM Mot. Dismiss at 20-21; YNHH Mot. Dismiss at 19.) In Connecticut, a reasonable employee

> should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace. There are few things more central to a person's life than a job, and the mere fact of being demoted or denied advancement may be extremely distressing. That is simply an unavoidable part of being employed.

*Perodeau v. City of Hartford,* 259 Conn. 729, 757 (2002) (employees should reasonably expect to be subject to other vicissitudes of employment, such as workplace gossip, rivalry, personality conflicts and the like). However, this does not mean employees should expect

12

to be subjected to conduct that "transgress[es] the bounds of socially tolerable behavior" and involves "an unreasonable risk of causing emotional distress." *Sangan,* 2006 WL 2682240 at *5 (quoting *Perodeau,* 259 Conn. at 757).

Defendants rely on cases that analyze the severity of a plaintiff's distress at the summary judgment stage in support of their argument that Craig's claimed suffering falls below what is required. *See Almonte v. Coca–Cola Bottling Co. of N.Y., Inc.,* 959 F.Supp. 569, 575-576 (D. Conn. 1997) (granted summary judgment because alleged symptoms of sleeplessness, depression, and anxiety do not support a claim of severe emotional distress since they are common among employees who have been fired); *Reed v. Signode Corp.,* 652 F.Supp. 129, 137 (D. Conn. 1986) (granted summary judgment because although not being rehired is distressing and implies incompetence and other undesirable traits, it is not severe).

Collectively, Craig's allegations of sleeplessness, loss of appetite, and emotional and psychological distress, in addition to his other symptoms, are sufficient at this stage to plausibly go beyond what a reasonable employee should be expected to endure. *See Wu v. Chang's Garden of Storrs, LLC*, No. 3:08cv746(WWE), 2009 WL 3769109, *5 (D. Conn. Nov. 10, 2009) (allegations that Plaintiffs (1) suffered from feelings of shame, humiliation, anger, worry, disappointment, helplessness, powerlessness, and that they (2) experienced regular loss of sleep, nightmares, headaches, and joint pain deemed sufficient to defeat Defendant's motion to dismiss); *see also Rogers v. Apicella,* 606 F.Supp.2d 272, 294 (D. Conn. 2009) (trouble sleeping, anxiety, headaches, nausea, bowel problems, and depression, considered collectively, were sufficient to survive summary judgment on IIED claim). The record of the degree and nature of Plaintiff's suffering requires further development, but Plaintiff's allegations are at least minimally sufficient at this stage to state a claim for intentional

infliction of emotional distress. Accordingly, Defendants' Motions to dismiss Count Seven for failure to state a claim are denied.

III.    Conclusion

For the reasons stated above, Defendants' motions to dismiss are GRANTED in part and DENIED in part: Count Three is dismissed, and Count Seven remains.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 22nd day of December, 2011.