UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Anthony Craig, M.D., Ph.D.,<br>        *Plaintiff,*<br><br>                *v.*<br><br>Yale University School of Medicine, *et al.*,<br>        *Defendants.* | Civil No. 3:10cv1600(JBA)<br><br><br><br>March 4, 2013 |

**RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Anthony Craig, M.D., Ph.D. is an African–American male and former resident in the Obstetrics & Gynecology Residency Program (the "Program") at Yale New Haven Hospital ("YNHH"). Following the termination of his employment in the Program on April 23, 2009, Dr. Craig sued Defendants Yale University School of Medicine ("YUSM"), YNHH, Dr. Errol Norwitz (in his individual capacity and as the Director of the Program), and Dr. Julia Shaw (in her individual capacity and as the Associate Director of the Program), asserting seven causes of action, four of which survived Defendants' Motion to Dismiss. (*See* Ruling on Defendants' Motions to Dismiss [Doc. # 46].) The four causes of action which remain are: Count One, Race and Color Discrimination under Title VII, 42 U.S.C. § 2000e, *et seq*. (against YNHH); Count Two, Race and Color Discrimination under 42 U.S.C. § 1981 (against YUSM); Count Five,

Breach of Contract (against YNHH)[1]; and Count Seven, Intentional Infliction of Emotional Distress ("IIED") (against all Defendants).

YNHH moves for summary judgment on Counts One, Five, and Seven. YUSM, Norwitz, and Shaw (collectively "YUSM") move for summary judgment on Counts Two and Seven. For the reasons that follow, Defendants' Motions for Summary Judgment will be granted in their entirety.

## I.    Factual Background[2]

### A.    Dr. Craig's Entry into the Program

It is undisputed that Norwitz and Shaw made the decision to admit Dr. Craig into the Program (Norwitz Aff., Ex. Y to YNHH's 56(a)1 Stmt. ¶ 4), and he entered the Program on June 21, 2008.

As part of the Program, he entered into a one–year employment agreement with YNHH, beginning on July 1, 2008 and ending on June 30, 2009. (YNHH Agreement, Ex.

---

[1] Although Count Five is lodged against both YUSM and YNHH, at oral argument, Dr. Craig clarified that he is only pursuing it against YNHH.

[2] Dr. Craig objects to citation deficiencies in YNHH's Local Rule 56(a)1 Statement. YNHH and YUSM largely cite to the same evidence in support of their Motions for Summary Judgment, YNHH has submitted an Amended 56(a)1 Statement correcting its deficiencies, and Dr. Craig has responded substantively, notwithstanding the citation deficiencies. Thus, there has been no prejudice to Dr. Craig, and the Court will consider YNHH's Amended Local Rule 56(a)1 Statement.

C to YNHH's 56(a)1 Stmt.)[3] In signing the YNHH Agreement, Dr. Craig understood that there was no guarantee that he would be offered a contract at the end of the first year, but if he performed well, he could be hired for subsequent years (Craig Dep., Ex. B to YNHH's 56(a)1 Stmt. at 22).

---

[3] Dr. Craig's responsibilities under the YNHH Agreement included:

    A.  Perform[ing] satisfactorily and to the best of his/her abilities the customary duties and obligations of the training program, as established by the program, including keeping charts, records and reports signed and up to date, as may be further set forth in the Statement of Resident/Fellow Responsibilities or in other departmental documents.

    B.  Abid[ing] by the Hospital policies and procedures and the Hospital's Medical Staff bylaws, rules and regulations insofar as they are applicable to Residents and Fellows.

       . . .

    I.  [P]ledg[ing] full commitment to his/her personal and professional development.

(*Id.*) The YNHH Agreement was "for one year (or less) as specifically established above. Appointment to subsequent years shall be dependent upon satisfactory progress in education and satisfactory performance of all duties." (*Id.*) The YNHH Agreement further provided that:

    C.  Unsatisfactory house staff evaluation can result in required remedial activities, temporary suspension from duties, extension of training or termination of employment and residency education. Egregious/misconduct violations may result in immediate dismissal from the program.

    D.  A Resident/Fellow shall have the right to grieve an adverse action as further set forth in the Grievance Procedure, included in the House Staff Manual.

       . . .

    K.  This contract is conditional upon satisfactory performance for the remainder of the current contract period.

(*Id.*)

3

Dr. Craig received the Resident's Manual in June of 2008, setting out the progressive discipline and grievance procedures. (*Id.* at 77.)[4] Dr. Craig was aware that

—————————————————

[4] The Resident's Manual provided that:

A grievance is defined as an expression of dissatisfaction regarding any of the following:

    a) the Resident's written contract

    b) duties assigned to a Resident

    c) application of Hospital or University policies

    d) unfair or inequitable discipline or performance reviews or evaluations

    e) an issue regarding non–renewal of a Resident's appointment

    f) termination of a Resident's appointment prior to the end of the contract term

    g) discrimination[.]

. . .

A. General Conflict Resolution

Every effort should be made to resolve all questions, problems and misunderstandings as soon as they arise.

. . .

It shall be the policy of Yale–New Haven Medical Center that the decision for probation, suspension and/or dismissal of residents in accredited training programs is the primary responsibility of the program director. This process should be progressive and objective and the final decision must be reviewed and approved by the chair of the department and reported to the Director/Associate Dean of GME prior to the probation, suspension and/or dismissal.

. . .

There are basic steps of progressive disciplinary action, as follows: <u>Resident Counseling</u> . . . <u>Verbal Warning</u> (oral reprimand) . . . <u>Written Warning</u>. . . .

<u>Probation</u>

    1. A resident may be placed on probation by a Program Director for reasons including, but not limited to any of the following:

        a. failure to meet the performance standards of an individual rotation;

        b. failure to meet the performance standards of the program;

4

    c.  failure to comply with the policies and procedures of the GME Committee, the Medical center, or the participating institutions;

    d.  misconduct that infringes on the principles and guidelines set forth by the training program;

    e.  when reasonably documented professional misconduct or ethical charges are brought against a resident which bear on his/her fitness to participate in the training program.

2. When a resident is placed on probation, the Program Director shall <u>notify the resident in writing</u> in a timely manner, usually within a week of the notification of probation. The written statement of probation will include a length of time in which the resident must correct the deficiency or problem, the specific remedial steps and the consequences of non–compliance with the remediation.

3. Based upon a resident's compliance with the remedial steps and other performance during probation, a resident may be:

    a.  continued on probation;

    b.  removed from probation;

    c.  placed on suspension; or

    d.  dismissed from the residency program.

      . . .

<u>Dismissal</u>

1. Dismissal from a residency program may occur for reasons including, but not limited to, any of the following:

    a.  failure to meet the performance standards of the program;

    b.  failure to comply with the policies and procedures of the GME Committee, the Medical Center, or the participating institutions;

    c.  illegal conduct;

    d.  unethical conduct;

    e.  performance and behavior which compromise the welfare [sic] and of patients, self, or others;

    f.  inability of the resident to pass the requisite examinations for licensure to practice medicine in the United States.

      . . .

5. Immediate dismissal can occur at any time without prior notification in instances of gross misconduct (e.g. theft of money or property; physical violence directed at an employee, visitor or patient; use of alcohol/drugs while on duty).

5

pursuant to these policies, he could be dismissed if he failed to meet the performance standards of the Program. (Craig Dep. at 68, 79.)

### B. Dr. Craig's Performance in the Program

Norwitz met with Dr. Craig in July and September 2008 to discuss Dr. Craig's difficulties in performing his duties in the Program (Norwitz Aff. ¶ 11), and advised him to meet with his career mentor, Dr. Christian Pettker, M.D., to discuss those issues (*id.*). On October 16, 2008, Norwitz met with all available chief residents to discuss Dr. Craig's performance. (*Id.* ¶ 12.)

On November 4, 2008, Norwitz met with Dr. Craig to discuss the unfavorable performance evaluations, written and submitted anonymously by twelve attending physicians with whom Dr. Craig had worked from June 23, 2008 to November 4, 2008 (Craig Dep. at 49, 130–31; Nov. Evaluations, Ex. I to YNHH's 56(a)1 Stmt). Five physicians reported that Dr. Craig had not passed his rotation, and nine reported that they would not be comfortable allowing Dr. Craig to manage their patients with a lesser degree of supervision. (Nov. Evaluations.) Although some evaluations were satisfactory, e.g., "Doing well and working hard" (*id.*), seven of them were distinctly negative.[5]

---

(Resident's Manual, Ex. D to YNHH's 56(a)1 Stmt.)

[5] Four of the negative evaluations evidence Dr. Craig's difficulties in the Program:

- anthony's [sic] was significantly below average on his first rotations. he did not know basic facts about OB; he was not able to present patients appropriately; he was not able to identify the important aspects of

Norwitz said that he and Dr. Craig would further review the evaluations at Dr. Craig's six month evaluation, one month hence. (Craig Dep. at 49.) Thus, from the time of the November 4, 2008 meeting, Dr. Craig was fully aware that there were serious concerns about his performance in the Program. (*Id.*) Norwitz left Dr. Craig a surgical

---

patient presentations; he also did not improve as time passed; he seems to be disinterested.

- I think this individual is untrainable for a surgical subspecialty. His sole interest seems to be the lab where he is probably best suited. Many attempts made by several individuals to help but no improvement. No respect for integrity of tissues. Still cannot tie a knot. Seems hostile at some ttimes [sic]. Culturally seems to be having a very difficult time making transition to Yale. Smart, but will never make it as a Yale resident without a very significant change which I do not think is possible. Probably would be best for him to try another field.

- There are significant problems with Anthony's skills and he is not qualified to continue with this ObGyn residency. He does not appear to understand how to care for patients. He does not had [sic] a basic compresion [sic] of disease processes. He cannot communicate with patients or professional staff. He lacks any urgency or intensity. At times I am not sure if he even understands the words I am saying to him. He is ineffective and inefficient. He cannot complete post partum rounds. He cannot recognize a critically ill patient. He lacks the dexterity and intensity to develop any skill in the OR. I thinks patietns [sic] in his care are at risk for adverse outcomes. Perhaps his skill set would be better applied in the lab or an alternative career.

- Anthony has shown no improvement since the beginning of his residency. He takes no ownership of his patients, is unable to evaluate patients, perform exams or interviews. He cannot prioritize. He needs to be under constant supervision.

*(Id.)*

7

knot–tying book and model and instructed him to meet with Dr. Dan Silasi to work on his knot–tying skills. (Norwitz Aff. ¶ 23.) Dr. Craig picked up the suturing kit from his mailbox over one month later (*id.* ¶ 23), but never met with Dr. Silasi (Craig Dep. at 38–39). Norwitz also suggested that Dr. Craig avail himself of the Employee Assistance Program to help with signs of depression, but Dr. Craig declined to do so. (Norwitz Dep. at 71:3–72:25.)

Shortly after Dr. Craig's meeting with Norwitz, Dr. Craig received a performance plan ("Benchmarks to Achieve") from Dr. Pettker (Pettker Benchmarks, Ex. J to YNHH's 56(a)1 Stmt), which included improvements in surgical skills, presentation skills, efficiency, communication, and knowledge (*id.*). Dr. Craig testified that he tried to work on some of the enumerated goals. (Craig Dep. at 90.) Dr. Pettker e–mailed Norwitz on November 16, 2008 that he told Plaintiff that "he is behind and really has only one or two months to get back on track, to help him sense the urgency of this situation." (Nov. 16, 2008 E–mail from Pettker to Norwitz, Ex. 8 to Pl.'s Loc. R. 56(a)2 Stmt.)

Dr. Craig acknowledged several incidents in which his performance was deficient. In one instance, Dr. Craig obtained informed consent in English from an exclusively Spanish–speaking mother for the circumcision of her son. When the child was taken out for the procedure, the mother became very upset, and an interpreter was called to explain the procedure to the mother. (Norwitz Dep. at 82:14–22.) Dr. Craig admits fault for this incident, explaining that he gave the mother a form regarding the procedure in Spanish, but acknowledging that it was his job to talk to the patient about the risks of the

procedure in a language the patient could understand. (Craig Dep. at 79, 80.) "[I]t happened once, I was very busy and I just gave her the form." (*Id.* at 85.)

In another instance, a nurse reported to Dr. Craig that his post–op patient was hemorrhaging. (Norwitz Dep. at 84:9–17.) Instead of going to see the patient, he gave the nurse instructions over the phone (*id.*), and admits that "it would have been more appropriate to actually go up to the floor and evaluate the patient" himself because it is hard to get information over the phone and the lack of information could impact a patient's safety (Craig Dep. at 86–87).

Dr. Craig also agrees that he was appropriately criticized for not controlling the head of a baby during a delivery, causing a laceration (*id.* at 84), and that he did not call for instruments during surgery, instead waiting for the tech to hand them to him or for the attending surgeon to tell him which instrument to use (*id.* at 85).

Dr. Craig received negative performance evaluations from attending physicians for his performance between November 1, 2008 through December 17, 2008. (*See* Dec. Evaluations, Ex. K to YNHH's 56(a)1 Stmt.)  Six physicians reported that he had not passed his rotation, and eight reported that they would not be comfortable allowing Dr. Craig to manage their patients with a lesser degree of supervision. (*Id.*) One particularly troublesome evaluation stated:

> He is unable to present in rounds: Anthony does not know the patients he is presenting, is not familiar with their history and pertinent points. He is unaware of pertinent details such as blood pressures in hypertensive patients, finger sticks in diabetics, temperatures in patients who have been febrile. He is unable to present all necessary information on a patient such

as G/Ps, contraception, Rubella status etc. — He does not follow up lab values that were discussed as pending in morning sign–out — he therefore does not know any of these lab values and cannot react on abnormal findings. This is a patient safety concern. — He lies. When asked about whether or not he has completed certain tasks or when asked information about patients, he lies, misinforms (ie stating that a patient has been afebrile when she has a fever, reassuring the senior residents that discharges and dictations are done when they are not). — He has poor social skills. He is unable to communicate with patients in an appropriate fashion — to the extent that multiple post–partum patients request him NOT to round on them or take out their staples. He also cannot communicate with senior residents or nurses – this is one of the reasons why the nurses no longer call him for patient evaluations. — He cannot multitask. He does not ask for help. He cannot prioritize. — He has no sense of urgency. Although there may have been a clear plan for him to start a hypertensive patient on antihypertensive medications, he fails to put appropriate orders in, contact the nurse and follow up. This is a patient safety problem. He fails to do this despite specific and step–wise instructions. — His surgical skills are significantly below the expected level 6 months into the residency. He is unable to perform a Cesarean section or call for instruments during the C–section. He is unable to tie knots. He cannot be trusted in the operating room. His knowledge of anatomy is poor, and his surgical steps are unpredictable. — So far (12/10), he has not set up a meeting with Dan Silasi although given several precise instructions on how to do that. — He is inefficient. . . . He does not respond to pages. He does miss deliveries because he will not return phone calls and therefore not be aware of what is going on on the labor floor. . . . His medical knowledge background is poor. He cannot answer questions and does not appear to read when he is unfamiliar with a certain subject. His skills have not improved over one month of OB. — He is unreliable. Although instructed to do something, he will fail to follow through. — He shows up late for rounds. He does not have lists printed for rounds. He fails to see all the patients on his list before morning sign–out. — He is disorganized, "forgets" tasks and is therefore unreliable. Every task he is given needs to be double–checked and verified, to ensure that it was done, and done properly, A large proportion of his work is actually performed by all the other residents which significantly increases the burden and work hours of all the other residents working with him. . . . [O]verall, the fact that he lies, cannot be trusted and is unreliable is a significant patient safety problem.

10

(*Id.*)[6]

###     C.     Dr. Craig's Dismissal from the Program

Dr. Craig was dismissed from the residency program on December 15, 2008. At the meeting for that purpose, Norwitz, Shaw, Jill Aulenti, and Dr. Pettker told Dr. Craig that his performance was egregious and that he was a danger to patient safety. (Norwitz Dep. at 91:16–22.) While Dr. Craig believed that he had been making progress, Norwitz and Shaw stated that he had been getting worse. (Craig Dep. at 90.) They suggested that he consider working in a laboratory with Dr. Marsha Guess instead of continuing in clinical practice, reflecting their awareness of Dr. Craig's passion for lab work. (*Id.* at 83, 120.) They also advised him that he could potentially transfer to Bridgeport Hospital or be a transfer match at other hospitals (*id.* at 97), and they offered to help him transfer to

---

[6] Three other evaluations were similarly critical:

- Dr. Craig's surgical skills . . .  are clearly well below his peers. At this point in the year, I don't feel comfortable allowing him to do very much in even a primary c–sec. He does not seem to anticipate the next step in surgery, is unable to tie knots adequately or stabilize tissue to throw a stitch in a safe manner. . . .

- There are other interns who started at the same level as Dr. Craig. However, the difference is that they are improving. It is not fair to the patients that 6 months into the internship the surgeon is unprepared and lacking in basic surgical skills.

- My issue with Anthony is not his knowledge base but he seemed completely disinterested in the ED rotation. He lacked any motivation to do his work, carried a small patient load and did not seem interested at all in the work he was doing nor his patient's care. . . . [H]is care was unsatisfactory.

(*Id.*)

another residency with a "slower paced community–based program . . . where he could still provide clinical care." (Shaw Dep. at 80:9–19.) Dr. Craig chose not to pursue any of these options. (Craig Dep. at 120.)

On December 22, 2008, Dr. Craig filed a grievance challenging the procedures used in dismissing him without warning or probation. (Grievance Letter, Ex. L to YNHH's 56(a)1 Stmt.) His letter made no mention of race or gender discrimination, nor did he when he met with the grievance panel. At his deposition, he testified nonetheless that at that time he had felt that he was the victim of race discrimination. (Craig Dep. at 44, 200–01.)

On February 12, 2009, the grievance panel issued a decision reinstating Dr. Craig to the Program, stating:

> It is evident from the documentation that Dr. Craig has had significant difficulty developing his clinical practice, professional judgment and basic surgical skills. These performance deficiencies are supported by input from a number of sources including Dr. Craig's peers, chief residents and professional associates. . . . While we received specific examples of Dr. Craigs' [sic] poor clinical practice and judgment, we are uncertain that there was an organized approach to remediation that might lead to dismissal. . . . While it is questionable as to whether Dr. Craig will succeed in the program, even with reinstatement in probationary status, it is the opinion of the panel that there was insufficient basis to forego the probationary step. The collective decision of the panel is to recommend that Dr. Craig be placed on probation with a specific performance improvement plan which includes measurable goals and the timeframe in which these must be completed. Should Dr. Craig fail to meet these performance goals in a timely fashion or engage in conduct "deemed an immediate danger to patients, himself or others[,]" he should be suspended and/or dismissed from the program according to the above referenced policy.

(Grievance Decision, Ex. M to YNHH's 56(a)1 Stmt.)

### D.    Dr. Craig's Probation

On April 6, 2009, Dr. Craig met with Shaw to review and sign a twelve–week performance improvement plan incorporating a list of objectives for him to meet. (*Id.* at 183.) In this meeting, Dr. Craig made no mention of race or gender discrimination. (*Id.* at 184.)

The Performance Improvement Plan (the "Plan") stated that "[i]f at any time during this probation period you exhibit behavior that endangers patient care, you may be terminated immediately without the possibility of grievance." (Performance Improvement Plan, Ex. N to YNHH's 56(a)1 Stmt.) Pursuant to the Plan, Dr. Craig had to pass a two–week trial in an outpatient setting and receive a 100 percent pass rate for the two–week rotation. (*Id.*) He also had to pass two oral examinations and a written exam in order to move on to the twelve–week remediation program. (*Id.*) The Plan further provided that "[i]f you do not successfully complete or fulfill all of the pre–clinical requirements, you will not be allowed into the inpatient setting, will be deemed unsafe for patient care, and your employment may be terminated from the residency immediately." (*Id.*) The Plan was constructed so that Dr. Craig would not have to work with any of the chief residents or any of the attending physicians who had previously criticized his performance. (*Id.*)

During his first two weeks of probation, Dr. Craig worked in the high risk and OB outpatient clinics. (Norwitz Dep. at 134:2–17.) The parties dispute whether Dr. Craig's

assignment to the high risk clinic was appropriate: Dr. Craig maintains that high risk patients are not normally seen by first–year residents (Craig Dep. at 225–30), while Norwitz counters that Dr. Craig "was assigned patients to evaluate under the supervision of the attendings, and the patients were specifically chosen to be low–risk patients" (Norwitz Dep. at 133–34).

Dr. Craig received performance evaluations from supervisors for his performance between April 1, 2009 to April 22, 2009. (*See* Apr. Evaluations, Ex. Q to YNHH's 56(a)1 Stmt.) Eight out of nine physicians reported that Dr. Craig had not passed his rotation, and all nine reported that they would not be comfortable allowing Dr. Craig to manage their patients with a lesser degree of supervision. (*Id.*)[7]

---

[7] Six evaluators wrote:

- [Dr. Craig] did not have any insight to the patient's problems and did not present a coherent plan for her.
- Dr. Craig has insufficient personal skills in interacting with patients in an appropriate clinical manner. While he can follow the cues on the EMR to ask the questions, he lacks adequate independent thought process to make the next step and ask related questions, not mentioned in the EMR. . . .
- [Dr. Craig's] level of competency is still at the level of [sic] third year medical student. I would have expected more from someone who knows he is under a pretty detailed evaluation period. . . .
- [Dr. Craig] falls short in his ability to use this knowledge for patient care. He is awkward around patients. In his 3 days in clinic, several patients commented that they were confused by his questions and explanations. He is also very thorough but his pace is too slow. Patients cannot remain in 1 visit for 2–3 hours.
- Dr. Craig has difficulty relating to staff, colleagues and patients. He does not react appropriately to verbal and non verbal ques [sic] from the people around him unless he is emphatically and directly

Dr. Craig scored 72 on the written exam, which was typically given to third–year medical students and on which 70 was a passing score (Norwitz Dep. at 140:1–4), but he failed his two–hour April 22, 2009 oral examination (Shaw Dep., Ex. F to YNHH's 56(a)1 Stmt., at 88:23–25). The examiners concluded that due to Dr. Craig's lack of insight, it was unsafe for Dr. Craig to return to clinical practice. (*Id.* at 100:24–101:4.) Dr. Joshua Copel, the former Director of Resident Education in the Department of Obstetrics and Gynecology at YUSM, reviewed the results of the oral examination. (Copel Aff., attached to YUSM's Loc. R. 56(a)1 Stmt ¶  6.) He opined that the topics addressed on the oral examination were appropriate for a first–year resident and that, in light of Dr. Craig's performance on the examination, Dr. Craig's dismissal from the Program was appropriate. (*Id.* ¶¶ 7–8.)

---

addressed. He has difficulty completing a history and physical exam with a patient, even when given the exact questions to ask. Dr[.] Craig is below the level of third year medical students that have been rotating in the clinic for a week. . . . He made up answers to questions he had not asked the patient and when probed further he would then say he had not asked question. . . . Dr[.] Craig does not have the necessary sensitivity, acuity of perception and critical thinking required to take care of patients.

- From my discussions with Dr[.] Craig, it is clear that he has good intentions and that he desires to be here. Due to the lack of significant progress that I[']ve seen in Dr. Craig from the last encounter to this one, the transformation into an effective, efficient, unsupervised clinician will not be possible within the scope of a residency training program.

(*Id.*)

Dr. Craig's was permanently dismissed from the Program on April 23, 2009. (Dismissal Letter, Ex. T to YNHH's 56(a)1 Stmt.) The vacancy for his position was filled the following year by an African–American female resident. (Shaw Dep. at 49–50.)

In 2008, there were 363 applicants for the Program (*id.*), for six "categorical" resident positions and one "preliminary," or one–year, resident position.[8] (Ex. H to YNHH's 56(a)1 Stmt.) Of the seven positions filled, three residents were African–American and two were African–American males. (*Id.*)

Over the past ten years, there have been ten female African–American residents and four male African–American residents in the Program, inclusive of Dr. Craig. (Resident List, Ex. G to YNHH's 56(a)1 Stmt.) Of the African–American male residents hired, Ebenezer Babalola graduated from the Program in 2003 (*id.*), and Omar Young, who was hired at the same time as Dr. Craig, is graduating from the Program this spring. (Norwitz Dep. at 40:14–20.) The parties dispute whether Valentine Edusa, the third African–American male resident, voluntarily resigned from his position as a second–year resident. If Dr. Edusa's resignation was voluntary, Dr. Craig would be the only African–American male terminated from the Program in the last ten years. (Norwitz Aff. ¶ 45.)

---

[8] Norwitz testifies that 12.9% of the total applicants were African–American and 4.1% were African–American males. (Norwitz Dep., Ex. E to YNHH's 56(a)1 Stmt. at 167:20–24, 169:21–24.) Ninety–one applicants were chosen for interviews, of which 16.5% were African–American and 5.5% were African–American males. (*Id.* at 167:22, 169:23–24.)

Norwitz was not the program director when Dr. Edusa was a resident. (Norwitz Dep. at 44:13–24.)

### E.    Alleged Discriminatory Acts

Dr. Craig claims that on December 14, 2008  an unidentified private physician called him "boy" three times during a half–hour shift (Craig Dep. at 23, 25), although Dr. Craig was not listed as working at YNHH on that particular date (Shaw Dep. at 156:6–25), and Dr. Craig did not tell anyone at YNHH or YUSM about this incident around the time it occurred (Craig Dep. at 23, 169).

Although neither his fellow residents, Norwitz, nor Shaw ever used any derogatory terms about his race or color or made any reference to his race or color (*id.* at 41), Dr. Craig felt discriminated against because "it was difficult to interact with [people and] they appeared to feel uncomfortable" (*id.* at 33). Norwitz told him "that [the other residents] just needed to get to know me better, so I did start going to more of their parties and activities outside of work." (*Id.* at 230.) In discussing feelings of discrimination, Dr. Craig describes that:

> [i]n general, it was an isolated type of environment or I felt sort of isolated from the other residents. I would see residents laughing and joking with each other, but—or having lunch with each other and so forth, and if I would try to have a conversation or start a conversation, the responses would be short or not really—they really, really didn't show a lot of interest in engaging in a conversation.

(*Id.* at 34.)

17

He claims that an upper–level resident, Dr. Nicole Kummer, was "friendly with other residents, but . . . very harsh and unfriendly towards [him]. . . . she was really more civil toward everyone else" (*id.* at 31), and that "in general, that it was difficult for [him] to interact with the upper level residents, the third and fourth years, because as [he] would try to interact, they would not seem to be interested" (*id.* at 33). Dr. Christine Richter, an upper–level resident, "would berate [Dr. Craig] in front of patients causing patients to lose confidence in [him], which seemed strange to [him]." (*Id.* at 33.) In one incident, Dr. Richter told Dr. Craig, in front of a patient, that he should be able to suture a laceration in two minutes (*id.* at 36), which led the patient to ask if Dr. Craig knew what he was doing (*id.* at 35). Dr. Craig believes that Dr. Richter's expectation of him was unreasonable (*id.* at 36), though he admits that it is the senior resident's job to counsel, evaluate, and criticize, when necessary, the performance of the junior residents (*id.* at 34).

Dr. Craig believes that the others in the program intended to cause him emotional pain in that the

> goal in the probationary period was to make it so difficult that, you know, I might want to leave on my own. . . . [They were] questioning my integrity by saying that I lie about patients or I make stuff up. You know, having your competence challenged on—under false pretenses after you've worked very hard to get where you are on things that you do[.]

(*Id.* at 238.)

During his meeting with Shaw before his probationary period, Shaw had "said that I should not come back because I won't be treated fairly when I return . . . and tried to convince me that I should take advantage of the other options that she was giving me."

(*Id.* at 261.) Dr. Craig testifies that Shaw told him that his chances of successfully completing the Program were "one thousand to one" against successful completion (*id.* at 262), and that the other residents were unhappy that he was returning and that she would need to counsel them about his return (*id.* at 263). During the termination meeting, Shaw "said I was being held to a lower standard. And I reminded her . . . she had told me I was doing a good job just a week earlier, and she said that was because I was being held to a lower standard." (*Id.* at 48.)

He describes this emotional pain manifesting itself in difficulty sleeping and trust issues, especially with authority figures, for which Dr. Craig started seeing a therapist. (*Id.* at 239.) Dr. Craig states that there were at least two occasions where he "was glad that [he] didn't have a gun in the house." (*Id.* at 252.)

### F.    Alleged Comparators

Dr. Craig attaches records from YNHH of three previous residents to illustrate Defendants' "pattern and practice of discrimination," because even though all three residents exhibited deficiencies, none were terminated. (*See* Exs. 16–18 to Pl.'s 56(a)2 Stmt. at 28.) None of the records indicate whether these residents were placed on probation, or whether they grieved any adverse employment decisions.

The prior resident records Dr. Craig proffers do not show a pattern or practice of discrimination. Resident 1, a white female, was issued a warning letter during her second year of residency and eventually transferred to a smaller OB/GYN program. (Resident 1 Records, Ex. 16 to Pl.'s 56(a)2 Stmt.)

19

Resident 2, a white female, was not issued a warning letter or placed on probation for her deficiencies, but rather resigned for personal reasons during her first year of residency. (Resident 2 Records, Ex. 17 to *id.*) Resident 2 received a recommendation letter from the OB/GYN Residency Director to help facilitate her application to another residency program. (*Id.*)

Resident 3, an African–American male, was issued many warnings and transferred to the same OB/GYN Program at Bridgeport Hospital that was offered to Dr. Craig. (Resident 3 Records, Ex. 18 to *id.*) Resident 3 was permitted to repeat his second year of residency before eventually tendering his resignation. (*Id.*)

## II.    Discussion[9]

YNHH moves for summary judgment on Counts One, Five, and Seven. YUSM moves for summary judgment on Counts Two and Seven.

---

[9] "Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

### A.    Count One (Title VII against YNHH) and Count Two (Section 1981 against YUSM)

Dr. Craig contends that YNHH discriminated against him because he is an African–American male, in violation of 42 U.S.C. § 2000e–2(a)(1), which prohibits an employer from discriminating against any employee, "because of such individual's race, color, religion, sex, or national origin." Dr. Craig also claims that YUSM discriminated against him in violation of 42 U.S.C. § 1981 which prohibits intentional discrimination in the employment context based solely on race. He alleges both an intersectional "race plus" gender claim of discrimination in the termination context against YNHH as well as "race" discrimination against YUSM. (*See* Ruling on Defendants' Motions to Dismiss at 6–7.) Dr. Craig also alleges a hostile work environment against YNHH and YUSM.

Defendants argue that Dr. Craig has failed to prove discrimination in the termination context or a hostile work environment.[10]

---

[10] Dr. Craig's allegations of discrimination from YNHH in Count One and from YUSM in Count Two are substantively the same, although the 42 U.S.C. § 1981 prohibits only racial discrimination and does not prohibit "race plus" gender discrimination. All parties agreed at oral argument that both claims are analyzed using the *McDonnell Douglas* framework, *see Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010), as set forth more fully in Section II(A)(1), *infra*. The only difference is that, under 42 U.S.C. § 1981, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action. . . . [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." *Patterson*, 375 F.3d  at 229. It is undisputed that YUSM made the decisions involving Dr. Craig's dismissal, and as such, this requirement is satisfied. In all other respects, Counts One and Two are identical and will be analyzed together.

#### 1.      Discrimination in Termination

To meet the minimal burden of establishing a prima facie case of discrimination in the termination context, "a plaintiff must show that he (1) is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). If shown, "the burden shifts to the employer to articulate a legitimate, non–discriminatory reason for the employee's dismissal. If such a reason is proffered, the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action."   *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The separate stages of a plaintiff's demonstration of a prima facie inference of discrimination and pretext "tend[s] to collapse as a practical matter under the *McDonnell Douglas* framework." *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 n.1 (2d Cir. 2002).

#### a.   Plaintiff's Prima Facie Case

Dr. Craig clearly satisfies prongs 1 and 3 of his prima facie case. The parties dispute whether Dr. Craig satisfies prong 2, that he was performing his duties satisfactorily, and prong 4, that the circumstances surrounding the termination give rise to an inference of discrimination.

The parties use different terminology to describe the second element. Defendants essentially argue that it requires that Dr. Craig have been performing satisfactorily at the

22

time he was dismissed, pointing to Dr. Craig's negative evaluations to show that he cannot prove this element. Plaintiff maintains that he need only show qualification for the position for which he was hired.

In *Slattery*, an action for wrongful termination based on age discrimination, the Second Circuit reasoned that "mere variation in terminology between 'qualified for the position' and 'performing . . . satisfactorily' would not be significant so long as, in substance, all that is required is that the plaintiff establish basic eligibility for the position at issue, not the greater showing that he satisfies the employer." 248 F.3d at 91–92. The court found error in the district court's use of the "performing . . . satisfactorily" language to become "the basis for a heightened requirement" of the plaintiff's eligibility for the position, reasoning that "[t]he qualification prong must not . . . be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his prima facie case, the employer's proffer of a legitimate, non–discriminatory basis for its decision." *Id* at 92. Defendants' formulation overstates *Slattery*, which concluded that although the "defendant did properly offer up its dissatisfaction with [plaintiff's] work performance as its legitimate business reason for discharge, there is no basis for the district court's conclusion that [plaintiff] lacked even minimal qualification for a job whose duties he had been performing for seven years." *Id.*

Thus, to satisfy the "qualification" element, Dr. Craig "must show only that he 'possesses the basic skills necessary for performance of [the] job.'" *Id.* Having an extensive resume and having been initially hired for the job, would suggest that Dr. Craig had

"basic eligibility" for the position. YUSM argues that "plaintiff's qualifications for entry into the Program have no bearing on his qualifications to remain in the Program" (YUSM's Reply at 4), and YNHH asserts that although Dr. Craig has a variety of degrees, "none of these degrees incorporated clinical work in the OB/GYN field, which turned out to be an area in which the plaintiff lacked talent." (YNHH's Reply at 6 n.2.) However, to require Dr. Craig to show that he already possessed more than minimal qualifications for the clinical residency's program to which he had been admitted is tantamount to the rejected "performing . . . satisfactorily" language and gives no recognition to the training objective of a residency program. Dr. Craig therefore satisfies his de minimus burden of establishing the second prong of his prima facie case.

As to element four, a court must determine "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive," *Chambers v. TRM Copy Ctr. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994), but "it is not the province of the summary judgment court itself to decide what inferences should be drawn," *id.*  The "mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis." *Zimmermann v. Assoc. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001). Dr. Craig offers five circumstances that he argues give rise to a sufficient inference of discrimination, which the Court will address in turn.

First, Dr. Craig argues that YNHH's statistics give rise to an inference of discrimination. Though a pattern or practice of discrimination demonstrated by way of

24

statistical disparities can be extremely probative, "when . . . relevant statistics are lacking and the probative evidence of discrimination is confined . . . [to] individual incidents, subjective decisionmaking methods are not sufficient to establish a pattern or practice of discrimination." *Ste. Marie v. E. R.R. Ass'n*, 650 F.2d 395, 405 (2d Cir. 1981).

Dr. Craig's statistical evidence is problematic. He offers no expert testimony analyzing the data or giving any interpretive context to the figures upon which he relies. *See Wright v. Stern*, 450 F. Supp. 2d 335 (S.D.N.Y. Sept. 15, 2006) (discussing the importance of expert statistical analysis in making statistics probative, such as demonstrating to a statistically significant degree that the disparity between protected and unprotected groups has not resulted by chance). He merely notes that Defendants' "record of accepting and retaining African–American males is abysmally low" (Craig's Opp'n at 22), but offers no comparative statistical data comparing male African–American OB/GYNs at YNHH with male African–American OB/GYNs in other residency programs. He offers no statistics about other residents terminated from YNHH, only highlighting three residents who resigned. Without any analytical context and given this very small sample size, Dr. Craig's statistical is not probative of the existence of race discrimination.

Second, Dr. Craig argues that Defendants set up his probationary period so that he was guaranteed to fail, claiming that Norwitz and Shaw counseled the physicians in his probationary rotation to fail him. The record contains no evidence of such counseling. Dr. Craig brought no experience or observation to the table on this contention, only

25

stating, "before this probationary period, [the physicians] had all met with Dr. Shaw, who, as far as I knew, gave them some sort of guidelines about the—about their participation in the probation and I'm not sure what was involved in those discussions." (*Id.* at 214.) While Norwitz assured Dr. Craig that he would be treated fairly upon his return (*id.* at 191), Dr. Craig believes that he was treated unfairly after his successful grievance and his first termination. Plaintiff's general subjective feelings that the Plan was too strict (*see id.* at 225 ("I was, basically, told that if I made one mistake any day, that I would be failed for that whole day, and I thought that was unfair during a probationary period.")) lacks probative force in the absence of comparators' performance improvement plans showing disparities.

Dr. Craig points to his assignment to the high risk clinic, which he contends was inappropriate for a first–year resident, as support for his view that Defendants set him up to fail so they could terminate him. He disputes Norwitz's testimony that Dr. Craig was only assigned low–risk patients. (*Id.* at 227; Norwitz Dep. at 133–34; *see also* Shaw Dep. at 77:12–23.) He admits that he did see some patients that were within his skill level at the high risk clinic (*id.* at 229), that he was supervised by high risk physicians (*id.* at 227), but states generally that some of the cases he encountered in the high risk clinic were "unusual cases for a six month intern" (*id.* at 229), without giving any specific examples of any high risk cases assigned to him. Thus, Dr. Craig's assignment to the high risk clinic when he returned for his probationary period, at a time when the general clinic

physicians were on vacation (Craig Dep. at 227), at most gives rise to a weak inference of targeting him for termination.

Third, Dr. Craig argues that the fact that Norwitz offered to refer Dr. Craig to Bridgeport Hospital after his termination implies that Defendants did not truly consider Dr. Craig a danger to patient safety. Dr. Craig insists that because the other African–American male resident who had resigned also transferred to Bridgeport Hospital that Defendants simply wished to pawn him off on another program because of his race and gender. However, Shaw explained that they offered Dr. Craig this transfer to another residency because it would be a "slower paced community–based program . . . where he could still provide clinical care." (Shaw Dep. at 80:9–19.) The record also shows that Resident 2, a white female, was issued a letter of recommendation to help facilitate her application to another residency program after her resignation, despite her problems during her residency. (Resident 2 Records.)

Fourth, Dr. Craig argues that some remarks made during his residency show discriminatory bias, including a comment in the November Evaluations that "[c]ulturally [Dr. Craig] seems to be having a very difficult time making transition to Yale. Smart, but will never make it as a Yale resident without very significant change which I do not think is possible." Since these evaluations were used by Defendants to support Plaintiffs termination, and drawing inferences in favor of Plaintiff, there could be a weak inference that Defendants endorsed or subscribed to this evaluation.

Finally, Dr. Craig argues that he was replaced by an African–American female, Dr. Raji (Shaw Dep. at 49–50), which gives rise to an inference of discrimination as a matter of law because she is not a member of his protected class—an African–American male. This evidence cannot support Plaintiff's prima facie case of discrimination under § 1981, since Dr. Raji is a member of his protected class as an African–American.

Because, as a practical matter, analysis of the inference of discrimination for the fourth element of a prima facie case and pretext collapse, *see Collins*, 305 F.3d at 118 n.1, the Court now considers the entire record to determine if Plaintiff has come forward with sufficient evidence to persuade a fact finder that Defendants intentionally discriminated against him on the basis of his race. *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir. 2001).

### b.      Legitimate, Non–discriminatory Reason for Dismissal

Defendants proffer a legitimate, non–discriminatory reason for Dr. Craig's dismissal: Dr. Craig's unacceptable job performance. *See Graham*, 230 F.3d at 38; *see also Eaton v. Coca–Cola Co.*, 3:06cv01664 (DJS), 2010 WL 2836737, at *14 (D. Conn. July 19, 2010). An employee's job performance is measured by whether it "'meets his employer's legitimate expectations'" *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985) (internal citations omitted), so long as those demands were not "'illegitimate or arbitrary,'" *id.* "Whether job performance [is] satisfactory depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Pub.*, 104 F.3d 26, 29 (2d Cir. 1997).

28

YNHH states that Dr. Craig was dismissed from the program because of performance deficiencies so severe that at times patient safety was threatened. (YNHH's Mem. [Doc. # 90] at 26.) YUSM references evaluations of Dr. Craig's poor clinical performance, lack of effort, lack of responsibility, and patient safety issues as the basis for his dismissal. (YUSM's Mem. [Doc. # 85] at 26.) Dr. Craig concedes that "bad performance to the degree that patients are in harm[']s way is sufficient for dismissal" (Pl.'s Opp'n at 27), and Dr. Craig acknowledges that if a resident exhibited all of the negative behaviors that were listed in his negative evaluations at the same time, that resident should be dismissed from the program. (Craig Dep. at 73–75.)

As detailed above, the summary judgment record is replete with evidence of Dr. Craig's poor performance. (*See* Nov. Evaluations; *see also* Dec. Evaluations; Apr. Evaluations.) Given the extensive negative evaluations and undisputed incidents of poor performance, Defendants have clearly met their burden of showing a legitimate, non–discriminatory reason for Dr. Craig's dismissal from the Program.

### c.      Pretext for Unlawful Discrimination

"[A]n employee may satisfy the ultimate burden of proving pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Dister v. Cont'l Grp., Inc.*, 859 F.3d 1108, 1113 (2d Cir. 1988) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). The pretext inquiry includes factual questions such as "'whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non–discriminatory purpose was stated only after the allegation of discrimination.'" *Xu–Shen Zhou v. State Univ. of New York Inst. of Tech.*, No. 11–4370–CV, 2012 WL 4800484, at *3 (2d Cir. Oct. 10, 2012) (citing *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993))).

Dr. Craig argues that Defendants' citing patient safety concerns as the basis for his dismissal is "untrue" because if he really posed a danger to patient safety, Defendants would not have offered to refer him to a different residency program. (Pl.'s Opp'n at 27.) As discussed above, Shaw's testimony describes the other residency program as different from Defendant's, being "slower paced [and] community–based." (Shaw Dep. at 80:9–19.) Dr. Craig further argues that the fact that YNHH did not follow established termination procedures, which Dr. Craig successfully grieved, "shows the extent of rampant discrimination in Craig's workplace." (*Id.* at 28.)

30

YNHH's asserted reason for Dr. Craig's discharge comports with its policies set out in the Resident's Manual that "[d]ismissal from a residency program may occur for . . . performance and behavior which compromise the welfare and [sic] of patients[.] . . . Immediate dismissal can occur at any time without prior notification in instances of gross misconduct." (Resident's Manual; *see also* YNHH Agreement ("Unsatisfactory house staff evaluation can result in . . . termination of employment and residency education. Egregious/misconduct violations may result in immediate dismissal from the program.").) Moreover, the record shows that YNHH's reason was not a post–hoc rationalization after the allegation of discrimination by Dr. Craig, as it was asserted throughout Dr. Craig's time as a resident in his meetings with Norwitz and in his evaluations. Further, it is difficult to impute to Norwitz and Shaw an invidious motivation to dismiss Plaintiff where it had been their decision to hire him. Where "the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (internal citation omitted).

Even viewing the record in the light most favorable to Plaintiff, because Dr. Craig offers insufficient evidence to overcome the substantial evidence of his clinical deficiencies as the reason for his discharge, no reasonable juror could conclude that his termination from the Program was pretextual and that he was discriminated against on

31

the basis of his race or "race plus" gender. Accordingly, Defendants are entitled to summary judgment as to Dr. Craig's unlawful termination claims.

### 2.    Hostile Work Environment

Title VII is violated when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), as is section 1981, *see Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) (recognizing § 1981 hostile work environment claims against individual defendants where certain discriminatory acts based solely on race give rise to a hostile work environment claim). To survive a motion for summary judgment, Dr. Craig must provide evidence from which reasonable jurors could conclude:

> (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.

*Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003) (citation omitted). The test for a hostile work environment is both subjective and objective, considering the totality of the circumstances. *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir 2003).

Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* For

conduct to be frequent, "[a]s a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Terry*, 336, F.3d at 143 (internal quotations and citations omitted). Although "[f]acially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim," *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002), conduct is not sufficiently severe if a plaintiff can only show "generalized feelings of discomfort," *Williams v. Cnty. of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999). In *Williams*, the Second Circuit affirmed a judgment as a matter of law for defendant setting aside a jury verdict for plaintiff on his racially hostile work environment claim. The district court held that the plaintiff had presented no evidence to show that his employer's acts were "racially motivated. The proof at trial, for example, did not include the use of racial epithets or racially derogatory comments either directed at plaintiff or widely used in the workplace." *Id.*

However, even without evidence of racially overt acts, a hostile work environment claim could withstand summary judgment with circumstantial evidence, particularly where egregious. *See Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (courts "recognize that most discrimination . . . is not carried out so openly as to provide direct proof of it. Accordingly, an aggrieved party may use circumstantial evidence to assert a prima facie case of discrimination."); *see also Lewis v. State of Conn. Dept. of Corr.*, 355 F. Supp. 2d 607, 622–23 (D. Conn. 2005) (Kravitz, J.) (Though "neither incident involved a comparably overt, egregious, and clear act of racial discrimination

33

(such as a barrage of racial slurs) . . . . The Court believes a reasonable trier of fact considering the totality of circumstances, could conclude that these [six] incidents, occurring over a relatively short period of time, 'were sufficiently continuous and concerted' to have altered the conditions of her working conditions as to constitute a hostile environment.").

"Although actionable harassment is not confined to explicitly racial conduct, 'the plaintiff is required to establish that the harassment complained of was based on [his race]'" *James v. Conn. Dept. of Corr.*, 3:05cv1787(CFD), 2009 WL 279032, at *6 (D. Conn. Jan. 14, 2009) (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)), as well as pervasive or severe. The only overt race–based conduct Plaintiff offers is the unreported incident in which Dr. Craig was called "boy" by an unidentified attending physician (Craig Dep. at 22). Dr. Craig does not allege that this physician played any part in his dismissal (*see id.* at 28).[11]

Dr. Craig claims that "the harassment and deplorable treatment [he] endured all had to do with his race and gender and the fact that he aspired to be part of a medical specialty that African–American males traditionally [are] not involved in." (Pl.'s Opp'n at 30.) Dr. Craig argues that the combination of feeling isolated, being preliminarily

---

[11] Under the circumstances, this "boy" comment may properly be classified a "stray remark," defined as "remarks made by someone other than the person who made the decision adversely affecting the plaintiff [which] may have little tendency to show that the decision–maker was motivated by the discriminatory sentiment expressed in the remark. *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007).

dismissed without proper procedure, being told that other residents would need to be counseled upon his return, being told he had slim chances of completing probation and the undocumented incident of being called "boy" culminate in sufficient pressure and humiliation to rise to the level of a hostile work environment. While subjectively Dr. Craig may well have felt pressure, in–hospitability, and humiliation, there is insufficient objective evidence to support a reasonable conclusion that these occurrences were the product of discriminatory intent, or, taken together, were severe enough to permeate his workplace with discriminatory intimidation. His hostile work environment claim fails, and summary judgment is therefore granted on Counts One and Two.

### B.    State Law Claims

Having granted summary judgment as to all of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims for breach of contract and intentional infliction of emotional distress. *See* 28 U.S.C. § 1367(c)(3); *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[I]n the usual case in which all federal–law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims").

### III.   Conclusion

For the reasons set forth above, Defendants' Motions [Doc. ## 84, 88] for Summary Judgment are GRANTED as to the federal claims, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims. The Clerk is directed to close the case.


IT IS SO ORDERED.


      /s/
_____

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 4th day of March, 2013.